**Odena S. VAN HOY, Plaintiff,**

v.

**Elliott L. RICHARDSON, Secretary of Health, Education, and Welfare, Defendant.**

**No. C–248–S–70.**

United States District Court,
M. D. North Carolina,
Salisbury Division.

Aug. 20, 1971.

Gerald R. Chandler, Albemarle, N. C., for plaintiff.

William L. Osteen, U. S. Atty., and J. Howard Coble, Asst. U. S. Atty., Greensboro, N. C., for defendant.

MEMORANDUM OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiff seeks judicial review, pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405 (g), of the final decision of the Secretary of Health, Education, and Welfare, denying her the establishment of a period of disability and for disability insurance benefits.

The plaintiff first filed her application for disability insurance benefits on December 15, 1969, alleging that she became unable to work "sometime in 1958,"

at 42 years of age, because of back trouble and swelling of the legs. The application was denied initially and upon reconsideration. Plaintiff thereafter requested a hearing before a hearing examiner. The requested hearing was held on April 17, 1970, before Hearing Examiner John H. Van Voorhis. On April 23, 1970, Hearing Examiner Van Voorhis rendered his decision, finding that plaintiff was not entitled to a period of disability or to disability insurance benefits. The Appeals Council thereafter denied plaintiff's request for review, following which this action was timely instituted seeking judicial review of the final decision of the Secretary. The entire administrative record has now been certified to the Court, and the parties have cross-moved for summary judgment.

■ It is conceded that plaintiff last met the special earnings requirements of the Social Security Act for disability purposes on June 30, 1961. Consequently, it was her burden to establish that she was under a disability, as defined by the Act, beginning not later than June 30, 1961, which lasted for a continuous period of not less than twelve months.

Effective July 30, 1965, the Social Security Act was amended by defining the term "disability" to mean " * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." The amendment had the effect of eliminating the requirement that the impairment be one which can be expected to be of long-continued and indefinite duration. Under the 1967 amendments to the Act, the statutory definition of "disability" was further clarified. These amendments provide that a claimant is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work," and the term "physical or mental impairment" is defined to be "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423. "Work which exists in the national economy" is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423. The 1967 amendments became effective on January 2, 1968, and apply to decisions in civil actions which had not become final before that date. Davis v. Gardner, 395 F.2d 681 (6th Cir. 1968); Daniel v. Gardner, 390 F.2d 32 (5th Cir. 1968). A reading of the legislative history of the amendments clearly discloses that Congress intended for the Secretary and the courts to be more restrictive in considering claims for disability insurance benefits, and intended that such claims be disallowed unless supported by clinical and laboratory findings, or other medically acceptable evidence.

The issue before the Court is the substantiality of the evidence to support the Secretary's findings on the issues before him. In Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), the prescribed standard of judicial review is stated as follows:

"The prescribed standard of review, found in section 205(g) of the Act, 42 U.S.C.A. § 405(g), is as follows: ' * * * The findings of the Secretary, as to any fact, if supported by substantial evidence, shall be conclusive, * * *.' Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance. Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The Secretary, and not the courts, is charged

with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). If his findings are supported by substantial evidence, the courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). In short, the courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize 'the record as a whole' to determine whether the conclusions reached are rational. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folsom, 257 F.2d 778 (3rd Cir. 1958); 4 Davis, Administrative Law (1958) § 29.02, pp. 118–126. If they are, they must be upheld; but if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary. Park v. Celebrezze, 214 F. Supp. 153 (W.D.Ark.1963); Corn v. Flemming, 184 F.Supp. 490 (S.D.Fla. 1960). In such a circumstance the courts are empowered either to modify or reverse the Secretary's decision 'with or without remanding the cause for a rehearing.' 42 U.S.C.A. § 405 (g)."

In Flack v. Cohen, 413 F.2d 278 (4th Cir. 1969), the rule is expressed as follows:

"It is elementary that the Secretary's findings must be accepted if they are supported by substantial evidence. Laws v. Celebrezze, 368 F.2d 640 (4 Cir. 1966). It is equally clear that the reviewing court may not try the case de novo and substitute its own findings for those of the Secretary. Hicks v. Gardner, 393 F.2d 299 (4 Cir. 1968). From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than uncritical rubber-stamping of the administrative action."

Plaintiff was born on November 15, 1916, and completed the eleventh grade in school. Afterwards, she took a business course in typing and shorthand, but this was interrupted after several months by a death in her family. Plaintiff worked as a waitress for approximately six or seven years, and then worked for six years as a telephone operator before she allegedly became disabled.

In her application, plaintiff stated that she became unable to work sometime in 1958 by reason of back trouble and swelling of the legs. She further stated that her back and legs pained her constantly, restricting her ability to stoop, bend, or stay on her feet for any length of time. She alleged that these conditions had grown much worse in the last four years.

At the hearing held on April 17, 1970, plaintiff testified that she was about 5 feet, 4 inches tall and weighed about 220 pounds. This degree of obesity had continued for a number of years. She testified that her housework was restricted by arthritis in her back and by the condition of her legs and feet. Her back condition prevented her from stooping, sweeping, and ironing, and she could not sit in a hard chair. Plaintiff used heat rubs, aspirin, and pain pills were taken for her back and legs. She contended that she had always had a weak back, and had noticed this in farm work as a young girl. After each of her pregnancies, her back and legs had given her more trouble, but that she got along fairly well until her last child was born on February 22, 1958. Plaintiff lives with her husband and twelve-year-old daughter. After stopping her business course, plaintiff worked on the farm with her father until she was married. When her first husband died in about 1946, plaintiff, with her son, 3½ years of age, and her daughter, six months of age, returned to the home of her parents. She worked that summer on the farm and then, while her mother cared for the children, she was manager of the lunchroom at a school for

one term. She planned the menus, did the buying, and kept records. She left this job to take a more promising one as manager of a tea room. However, this latter job did not work out because the owner hurt the business by early closing. Plaintiff then bought a restaurant about July, 1950, in Albemarle, North Carolina, hoping to make a success of it so that she could have her children with her, but she had to give it up before Christmas because she could not obtain reliable help. Plaintiff next worked about two months as a waitress in a drug store, getting a raise to $.75 an hour while there. She left this employment to take a job as a switchboard operator at a telephone company, working at the same salary, plus overtime. Her hourly rate eventually rose to about $1.25. Plaintiff lost this job when the telephone company changed over to the dial system. Although she probably could have transferred to Concord, North Carolina, she decided against this employment because of the commuting distance, and she was expecting a child. This was just before the first of 1958. Afterwards, the only work plaintiff tried was selling Avon products for about six months, but her back was giving her trouble, and her stomach had stayed sore since the birth of her last child. She gave up the job because it was too tiring and because of her medical problems.

On January 19, 1970, Dr. Thomas F. Kelley reported that he examined plaintiff in April of 1966, and that she had made infrequent visits to his office thereafter until his last examination on November 5, 1969. Obesity, bilateral varicose veins of legs, and unstable low back pain was diagnosed. In answering request for specific dates, Dr. Kelley entered question marks for date of plaintiff's first signs of illness and the date her impairment first prevented her from working. Plaintiff gave a history of excessive post menopausal vaginal bleeding in August of 1969 after her last monthly period in June of 1969. She had a hysterectomy in November of 1969, at which time she weighed 243 pounds. She had

slight ankle edema and bilateral varicose veins in her lower extremities, in addition to well-healed scars where vein stripping had been done in 1963. There was some spasm of the paravertebral muscles of the lower back, and she had an undiagnosed slow heart beat by electrocardiogram.

Dr. John Herring reported in his hospital discharge summary that plaintiff was in Stanly County Hospital from November 12, 1969, until November 29, 1969, and the diagnoses made there were post menopausal bleeding and cystic hyperplasia of endometrium. Dr. Herring mentioned plaintiff's history of excessive bleeding between menstrual periods, and noted that after treatment she had D&C's done 25 and 4 years ago, as well as a D&C for fibroid tumors 13 years ago. On examination, plaintiff's cervix appeared scarred but benign, and her uterus had dropped, but showed no masses. Her blood pressure and heart were normal, and prior to surgery Dr. Kelley had given her cardiac clearance. On November 13, 1969, a D&C at the hospital yielded some grossly hyperplastic endometrial tissue. On November 18, 1969, a vaginal hysterectomy was performed. Except for low grade fever treated by medication, and thought to be due to a vaginal infection, the post-operative course was uncomplicated and plaintiff was discharged to be followed as an outpatient. In a report dated January 12, 1970, Dr. Herring added that he had first seen plaintiff on November 4, 1969, and that counting three office visits, he last saw her on December 29, 1969. Dr. Herring listed no diagnostic additions or changes.

On March 19, 1970, Dr. Kelley reported that he had previously treated plaintiff from 1958 to 1964. He noted that the delivery of her child in 1958 was difficult and complicated by her obesity and her tendency to hypertension, and that she told him she had severe low back pain after her delivery. To Dr. Kelley's knowledge, she had not gone back to work. He further reported that he saw plaintiff for a postpartum checkup in

April of 1958, for an upper respiratory infection and hypertension in April of 1959, and for severe bursitis in 1960. Plaintiff continued to complain of back and sacral pain, but nothing definite was done. He did not see her again until 1964. At the few times he had seen her after the delivery of her child in 1958, plaintiff complained of backache, and in view of X-ray findings in February of that year, he reported that it was obvious that plaintiff had a reason to complain, for he was sure the condition disclosed by X-rays had not developed overnight. From the February 1970 X-rays, plaintiff had pronounced avascular changes in both hip sockets, particularly on the right side, with loss of cartilage in the joint space. Dr. Kelley felt that this was probably what plaintiff was complaining about from 1958 to 1961.

In a statement dated April 14, 1970, Dr. Kelley stated that he had found from his notes that plaintiff was treated for cellulitis of the left lower extremity in May of 1961. He mentioned this because on a visit to him a week earlier to discuss her application, plaintiff was again coming down with cellulitis, probably very similar to what was plaguing her in 1961. Dr. Kelley believed this was a factor which could aid in recognizing that plaintiff was having great difficulty with being on her feet in any effort to work in 1961 or earlier.

The only evidence of plaintiff's disability prior to June 30, 1961, the date she last had an insured status, was the testimony of the plaintiff herself and the medical reports of Dr. Kelley. The Hearing Examiner did not doubt that the plaintiff was under a disability at the time of the hearing, but found the evidence insufficient to show a disability prior to June 30, 1961. Dr. Kelley only reported that plaintiff was probably disabled as early as June 30, 1961, because of findings made in 1970.

After carefully reviewing the entire administrative proceedings and considering the record as a whole, the Court is of the opinion that there is substantial evidence to support the findings of the

Secretary that the plaintiff, considering her age, education and work experience, was physically able to engage in substantial gainful activity at all times prior to June 30, 1961, when she last met the special earnings requirement of the Act.

It having been concluded that the Secretary's decision is supported by substantial evidence, and that the conclusions he reached are rational, it follows that the defendant's motion for summary judgment should be granted and that the motion of the plaintiff for summary judgment should be denied.

A judgment will be entered accordingly.